Filed 8/19/14  P. v. Ramos CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JONATHON CHARLES RAMOS,<br><br>    Defendant and Appellant. | 2d Crim. No. B244670<br>(Super. Ct. No. F461346)<br>(San Luis Obispo County) |

Jonathon Charles Ramos appeals the judgment entered after a jury convicted him of first degree residential burglary (Pen. Code,[1] § 459), attempted murder (§§ 187, subd. (a), 664), infliction of corporal injury on a former cohabitant (§ 273.5, subd. (a)), and assault with a deadly weapon (§ 245, subd. (a)(1)).  The jury found true allegations that (1) victim Jennifer Doe was present during the burglary (§ 667.5, subd. (c)(21)); (2) the attempted murder was willful, deliberate, and premeditated (§§ 189, 664, subd. (a)); (3) appellant personally used a deadly and dangerous weapon, i.e., a knife, in committing the burglary, attempted murder, and infliction of corporal injury (§ 12022, subd. (b)); and (4) in committing all four crimes appellant personally, willfully, and unlawfully inflicted great bodily injury upon Jennifer Doe under circumstances involving domestic violence (§ 12022.7, subd. (e)).  In a subsequent sanity phase, the jury found

---

[1] Unless otherwise noted, all further statutory references are to the Penal Code.

appellant was sane when he committed the crimes. The trial court sentenced him to a total term of life with the possibility of parole plus five years. Appellant raises claims of prosecutorial misconduct and instructional error. We affirm.

STATEMENT OF FACTS

*Prosecution*

Appellant and Jennifer Doe began dating in early 2010. In early 2011,[2] the relationship began to deteriorate. Appellant became jealous of Jennifer's interactions with other men and often accused her of cheating. He was also sad and depressed.

Jennifer ended the relationship in early May after appellant refused to seek treatment for his emotional issues. Later that same day, Jennifer offered to drive appellant to a county mental health facility. Appellant accepted the offer, but only stayed at the facility for one night. Upon his release he was given a prescription for venlafaxine, an antidepressant generally known by its trade name Effexor.

Appellant continued to be depressed and upset about the breakup. In early June, he sent Jennifer a text message wishing her well and left a note on her door that read, "I miss you." After he sent additional texts referring to her as a "slut" and "bitch," she blocked his number.

On June13, Jennifer went to bed around 11:00 p.m. At about 2:00 a.m., appellant left a voicemail for his friend Peter Ljepava saying he "couldn't do it any more" and was going to leave. Appellant also left a voicemail for his friend Neal Breton stating that he loved him and was going to kill himself. Earlier that day, appellant told Breton he felt "out of it" because his medication was too strong. Appellant also said he had tried to kill himself the previous day, but felt better that day.

Ljepava called appellant back shortly after receiving his message. Appellant sounded distraught and was crying. He told Ljepava he was going to "peace out" of this planet. In a subsequent call, appellant said he could not "handle it" anymore.

---

[2] All further dates refer to the year 2011 unless otherwise stated.

Appellant called Ljepava a third time several minutes later. Appellant was walking and breathing heavily and had changed "from the sad melancholy person who was just out of it to this completely different angry [and] more up-beat, talking faster, rambling and ranting kind of person." Appellant told Ljepava he was "going to take [Jennifer] with him" and "rambl[ed] about [how] the universe was ever expanding and we were all just a little part of it." As soon as appellant hung up the phone, Ljepava called 911 and directed the police to the boardinghouse where Jennifer lived. Ljepava did not recall telling the police appellant had also said "he was going to pay for it for a long time" or that "she better watch out."

At about 3:30 a.m., Jennifer awakened to find appellant on top of her. He said something about loving her and alluded to a knife while his hand was raised. Jennifer screamed, and appellant repeatedly stabbed her. Within a matter of seconds, appellant jumped off the bed, threw the knife on the floor, and left. Jennifer was transported by ambulance to the hospital, where she received treatment for stab wounds to her head, arm, and leg.

A police officer responding to Ljepava's 911 call arrived at the scene and saw appellant running from Jennifer's residence. Appellant ignored commands to stop and ran to a nearby hospital. He told hospital staff he had stabbed his girlfriend.

The police went to the hospital and found appellant lying on a bed. He appeared happy and excited to see them and said, "I stabbed my girlfriend." When asked what had happened, appellant repeated, "I stabbed my fucking girlfriend a bunch of times." When asked why, appellant said, "I needed a release of energy. I have all this rage that I needed to get out. She was keeping me in a box and I had to release it." He admitted trying to kill Jennifer and said he used his pocket knife to stab her. He also said he had left the knife at Jennifer's residence along with his iPod and sweater.

Appellant's mood varied from cooperative to rude during the 15-minute conversation. He did not smell of alcohol or appear to be under the influence of drugs. He said he wanted to kill himself and asked the officer to shoot him. Appellant also

3

asked if the officer had ever killed a man by placing a weapon in his body and said, "It feels good."

Appellant was interviewed again a few hours later at the police station. A videotape of the interview was shown to the jury. Jurors were also given a transcript of the interview. Appellant did not appear manic during the interview. He was not in handcuffs. He said he had been suffering from depression and having a difficult time functioning on a daily basis. He suspected he might also be bipolar or schizophrenic. He had been taking Effexor since early May and had taken a dose the previous morning. He had also consumed alcohol the night before. Although he was not impaired by alcohol when he stabbed Jennifer, it was possible that it helped precipitate the attack.

Appellant told the police that he left his iPod, cell phone, and sweater near the front door before he entered Jennifer's residence. He also recalled telling Jennifer he loved her and then stabbing her numerous times, but denied he had tried to kill her. He said he "needed to purge" and had followed a "sign" at the center of his vision. He acknowledged he might have told the officer at the hospital that he tried to kill Jennifer. At the urging of the police, he wrote a two-page apology to Jennifer expressing guilt and regret for his actions.

The police searched appellant's home and found a prescription bottle of Effexor and several slightly-chewed 150 milligram capsules. The prescription had a warning label directing appellant to call his physician if his feelings of sadness or fear worsened or he had thoughts of suicide.

*Defense*

Appellant's mother testified that he began suffering from depression as a teenager and had a family history of mental illness. Prior to the incident, appellant worked in technical support at a computer store. His supervisor characterized him as a dependable and exemplary employee. When appellant returned to work after being gone for a few days, he told his supervisor he was in treatment for depression and was taking medication he hoped would help.

4

Appellant and Emily Medcalf dated in high school. She always found appellant to be caring, empathetic, thoughtful, and genuine. Although he was sometimes jealous during the relationship, he was never angry, violent, or suicidal.

Dr. Lucy Davis conducted several counseling sessions with appellant during the two months prior to the attack. Appellant initiated the counseling to address relationship issues and his feelings of jealousy. Dr. Davis diagnosed appellant with severe major depression, without psychotic ideation. The doctor ruled out bipolar disorder and never observed symptoms of the disorder. Although appellant reported binge drinking and drug use and admitted using marijuana, the doctor concluded he did not have a substance abuse problem. Appellant expressed suicidal ideation and said he had been suicidal around the time of his junior year in high school.

On May 5, appellant was voluntarily admitted to a county behavioral health facility as a danger to himself. He was diagnosed at that time with severe and recurrent major depression, without psychotic features, and cannabis abuse. He was lucid upon admission and asked questions about bipolar disorder, although he had no history of mania. He was discharged at his request the following morning by psychiatrist Dr. Ronald Morgan. Dr. Morgan prescribed appellant Effexor and instructed him to avoid alcohol and other drugs because they could render the medication ineffective. Appellant signed a form verifying he had reviewed the medication's side effects with the attending physician.

Dr. Morgan testified that all antidepressants have potential side effects including suicidal thoughts, mania, hostility, disorganized thinking, hallucinations, and alcohol abuse, particularly in patients under the age of 24. Alcohol and marijuana can also aggravate depression and increase suicidal thoughts.

Dr. David Fennell, a forensic psychiatrist employed at Atascadero State Hospital and the San Luis Obispo County Jail, treated appellant from the date of his arrest through June 2012. Dr. Fennell observed mood instability and changes in mood during appellant's first week of incarceration, but no symptoms that would warrant a diagnosis of bipolar disorder. The doctor instead diagnosed appellant with borderline personality

5

disorder, with an associated mood disorder and depression. Borderline personality disorder is characterized by rapid changes in mood, while those with bipolar disorder experience manic states that last a week or more. A person with borderline personality disorder who is under stress tends to have more extreme feelings of anger and more severe thoughts of self-harm and rage.

According to Dr. Fennell, any adverse reactions a patient might suffer from Effexor would almost always occur early, rather than 40 days after dosing had begun. Dr. Fennell discontinued appellant's Effexor prescription on June 24 due to appellant's complaints that the drug made him feel anxious, overly active, and suicidal. In early August the doctor prescribed lithium, a mood stabilizer effective in treating both depression and bipolar disorder. Appellant reported to the doctor that the lithium made him feel better, more stable, and less depressed. At the time of trial appellant was taking both lithium and Trileptal, a medication used to treat mood instability and bipolar disorder.

Psychiatrist Dr. Hadley Osran evaluated appellant on June 12, 2012. Dr. Osran diagnosed appellant with bipolar disorder. The doctor explained that patients with the disorder are often misdiagnosed with depression absent a documented history of manic episodes, which are often unreported by the patient. Appellant's 150 milligram daily dosage of Effexor is appropriate for patients suffering from depression, but not for patients with bipolar disorder unless they are monitored and perhaps given a mood stabilizer as well. This is because Effexor can cause a patient with bipolar disorder to quickly fluctuate between mania and depression. Effexor can also cause insomnia, which can make one less alert and more irritable. Alcohol induces sleep but disrupts the dreaming phase. Alcohol's effects on sleep interruption are enhanced when combined with Effexor.

Appellant testified that he was aware of the warning to call his doctor if he had any changes in mood or thoughts of suicide. He also knew he should not consume alcohol or other drugs while taking Effexor, yet he did so on the nights leading up to the attack.

6

On June 13, appellant went to work and attended rehearsal for his band. He and a friend then bought a pint of whiskey and went to a drive-in movie, where they drank some of the alcohol and smoked marijuana. Appellant did not drink to the point of intoxication.

Sometime after midnight, appellant made the decision to commit suicide. He called Medcalf and a few other friends to say goodbye. When Medcalf returned appellant's call, he cried throughout the conversation and eventually hung up on her. Medcalf called appellant back several times, and each call ended the same way. Appellant refused to tell Medcalf where he was and said, "You'll only find my body." During Medcalf's last conversation with appellant, she invited him to join her at her home in Seattle. According to Medcalf, appellant's voice was now "sing-song" and he asked questions as if he had not spoken to her previously. After he began crying again and hung up, Medcalf called 911.

Appellant ultimately decided to walk to the train station and commit suicide. When he came upon Jennifer's residence, the porch light reminded him of the moon and assured him his death would save him from the dark spirit that had been overwhelming him since he left his apartment. He then decided to kill himself at Jennifer's residence because he wanted to die where he felt loved.

Appellant went into Jennifer's room. After telling Jennifer he loved her, he felt a lurching movement akin to a cold fire that was causing him to melt. He heard a terrible sound and started to feel blows to the right side of his head. He realized that someone was screaming and saw Jennifer's blood. Appellant felt an object in his hand, dropped it, and ran to the hospital seeking help for Jennifer.

Appellant acknowledged the stabbing was his fault, but he never intended to kill Jennifer; he merely intended to harm himself in order to save his soul. He believed the Effexor agitated his mental illness and caused him to commit the attack, which he characterized as a freak accident. When confronted with the fact that his interviews at the hospital and police station did not include any mention of a plan to commit suicide, appellant merely offered he could not remember whether he had mentioned such a plan.

7

About five hours after the attack, appellant's blood tested negative for alcohol and positive for THC, the active ingredient in marijuana. He also tested positive for a therapeutic dose of Effexor.

*Rebuttal and Surrebuttal*

The jury was given the five-page transcript of a half-hour Facebook chat appellant had with a woman named Verdi Gogh less than two hours prior to the attack. During the chat, appellant said he had broken up with Jennifer and referred to her as a "bitch." He told Gogh that his band was doing well and that he was expecting a job promotion. Appellant said, "Meeting new people. Loving life. Smooching strangers." He also said, "I'm just on a roll with the whiskey I've had" and added, "smoking a bowl in your honor." Appellant told Gogh, "You look good. If I didn't like Matt, I'd bug you way more." Appellant continued, "If [it] had been okay at the time, I would have been more forward with you and never given her the time of day."

Alana Rodriguez dated appellant from June 2009 through January 2010. They began living together two months into the relationship. According to Rodriguez, appellant was very jealous and wanted her to stop seeing all of her male friends, particularly those who were ex-boyfriends. Appellant also believed that Rodriguez did not pay enough attention to him. She felt demeaned and mentally abused. When they argued or when Rodriguez spent time with other people, appellant often sent her text messages threatening suicide. Later when she arrived home, he would tell her about the phone calls he had made to suicide hot lines. On one occasion he made a gesture connoting suicide by scratching his arms with kitchen knives. Rodriguez acknowledged that appellant never assaulted or threatened her during or after the relationship, and had not harassed her since they broke up.

After appellant and Rodriguez broke up, she told his mother about the suicide gesture. Appellant's mother told Rodriguez he had done the same thing when he was in high school. Appellant's mother denied having such a conversation or ever discussing whether he had threatened suicide.

8

DISCUSSION

I.

*Prosecutorial Misconduct*

Appellant contends the prosecutor committed misconduct by eliciting Rodriguez's testimony regarding appellant's jealousy. He claims the testimony was evoked in violation of the trial court's in limine order excluding such testimony.

Appellant did not object to the testimony when it was given or seek a curative instruction, so his claim is forfeited. (*People v. Gamache* (2010) 48 Cal.4th 347, 371.) This is not a case in which a timely objection to the alleged misconduct would have been futile. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 680.)

In any event, the claim lacks merit. Had appellant objected when the testimony was elicited, the court may well have ruled it admissible. The trial court initially excluded all of Rodriguez's proffered testimony under Evidence Code section 352. After appellant's friend Neal Breton testified that appellant had never threatened suicide, the court ruled the prosecutor could elicit testimony from Rodriguez to rebut that evidence. In the context of that ruling, the court doubted that Rodriguez's testimony "would ever be relevant on the issue of jealousy" as described in the prosecution's offer of proof. Appellant, however, later elicited Medcalf's testimony that he was "an extremely caring, empathetic genuine person, thoughtful." The prosecutor was entitled to rebut this evidence of appellant's good character. (Evid. Code, § 1102, subd. (b); *People v. McFarland* (2000) 78 Cal.App.4th 489, 494.) Moreover, Medcalf herself testified that appellant was sometimes jealous, and appellant admitted as much. In light of this testimony, which corroborated that of the victim, and the other evidence of appellant's guilt, the error would be harmless under either potentially applicable standard of review. (See *People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1323 [prosecutorial misconduct that violates federal due process reviewed for error under *Chapman v. California* (1967) 386 U.S. 18]; *People v. Barnett* (1998) 17 Cal.4th 1044, 1133 [misconduct that violates only state law reviewed under standard set forth in *People v. Watson* (1956) 46 Cal.2d 818].)

## II.

### *Voluntary Intoxication*

Appellant sought to establish that his attack on Jennifer was caused by an adverse reaction to Effexor, such that he was not guilty of the charged crimes of burglary and attempted murder. To that end, he requested the standard jury instructions on involuntary intoxication (CALCRIM No. 3427), voluntary intoxication (CALCRIM Nos. 625, 626), and unconsciousness (CALCRIM No. 3425). The trial court gave a modified version of the latter instruction providing that appellant was not guilty of any of the offenses if he acted while legally unconscious and that unconsciousness may be caused by "involuntary intoxication due to an adverse reaction to medication." The court gave the instruction in light of appellant's testimony that he did not recall the attack. The court refused to give the instructions on involuntary and voluntary intoxication, reasoning that the modified instruction on unconsciousness was sufficient to convey appellant's theory of defense.

Appellant claims the court prejudicially erred in failing to give instructions on voluntary intoxication, and in modifying the unconsciousness instruction in the manner it did. He further claims the court had a duty to modify his requested instructions to inform the jury that a finding of intoxication could be predicated on either Effexor, alcohol, marijuana, or any combination thereof.

The question whether any intoxication in a given case was voluntary or involuntary is essentially one of fact. Appellant contends that no reasonable jury could have found his intoxication to be other than voluntary because he mixed the Effexor with alcohol and marijuana with knowledge of its negative consequences. We conclude that any error in failing to instruct on voluntary intoxication was harmless because appellant's testimony that he was unconscious as a result of voluntary intoxication was self-serving and was directly contradicted by his prior statements and the rest of the evidence.

Moreover, the court had no duty to give additional instructions on voluntary intoxication. A trial court must instruct the jury sua sponte on the general principles of law that are closely and openly connected to the facts and that are necessary for the jury's

10

understanding of the case. (*People v. Moye* (2009) 47 Cal.4th 537, 548; *People v. Breverman* (1998) 19 Cal.4th 142, 154-155.) The court is not obligated, however, to instruct sua sponte on voluntary intoxication. Voluntary "[i]ntoxication is now relevant [after diminished capacity was abolished as a defense] only to the extent that it bears on the question of whether the defendant actually had the requisite specific mental state. Thus it is now more like the 'pinpoint' instructions . . . to which a defendant is entitled upon request. Such instructions relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case, such as mistaken identification or alibi. [Citation.] They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte." (*People v. Saille* (1991) 54 Cal.3d 1103, 1119, citations omitted.) As the proponent of the instructions, appellant bore the burden to present substantial evidence not only of his voluntary intoxication, but also to show how the intoxication affected his "'actual formation of specific intent.' [Citations.]" (*People v. Williams* (1997) 16 Cal.4th 635, 677; see also *People v. Verdugo* (2010) 50 Cal.4th 263, 295.)

Because instructions on voluntary intoxication are pinpoint instructions that must be requested by the defendant, there is no merit in appellant's claim that the court was required to tailor his requested instructions to more closely conform to his precise theory of the case. Appellant also failed to show that the instructions he actually requested were warranted. First, he made no effort to argue he was intoxicated as a result of alcohol or marijuana. Neither Jennifer nor the police smelled alcohol on appellant's breath, and he tested completely negative for alcohol several hours after the attack. Moreover, appellant testified that he was not impaired from alcohol at all. (See *People v. Rodriguez* (1986) 42 Cal.3d 730, 762 [instructions on voluntary intoxication not required where defendant stated he was "not drunk"].) He did offer theoretical evidence that Effexor has side effects and that alcohol and other drugs can potentiate the medication. He offered no evidence, however, that he was suffering from those effects when he committed the attack on Jennifer. He similarly failed to offer any evidence as to how his alleged intoxication affected his actual formation of the intents necessary to commit

11

burglary and attempted premeditated murder.  (*People v. Williams, supra*, 16 Cal.4th at p. 677.)

Even if appellant could establish the error of which he complains, it would be harmless.  He essentially argued that the Effexor exacerbated the symptoms of his mental disorder.  The jury was instructed it could consider evidence of that disorder in deciding whether appellant acted with the intent and mental state required for burglary and attempted premeditated murder.  The jury impliedly found the evidence did not undermine the ample proof that appellant acted with a requisite mental state and specific intent when he entered Jennifer's room, climbed on top of her, and repeatedly stabbed her.  Because it is not reasonably probable the lack of instructions on voluntary intoxication had any effect on the verdict, any error occasioned by their absence was harmless.  (*People v. Pearson* (2012) 53 Cal.4th 306, 325 ["reasonable probability" standard of review applies to error in refusing to give pinpoint instructions on voluntary intoxication].)

## III.

### *CALCRIM Nos. 3428 and 627*

Appellant contends the court gave modified versions of CALCRIM Nos. 3428 and 627 that erroneously instructed the jury to find him not guilty of attempted murder unless it also found he acted with willfulness, premeditation and deliberation.  He claims these erroneous instructions "imposed a statutorily unauthorized 'all or nothing choice' upon the jury" in violation of his federal constitutional due process and jury trial rights.  We agree that the instructions were erroneous.  We conclude, however, that the error is harmless because (1) other instructions informed the jury that a conviction of attempted murder was not contingent on a finding of willfulness, premeditation and deliberation; and (2) the confusion created by the erroneous instructions was cleared up by the court during deliberations.

The jury was given the standard instruction on the elements of attempted murder (CALCRIM No. 600).[3] The jury was then instructed pursuant to CALCRIM No. 601 that "[i]f you find [appellant] guilty of attempted murder under Count 2, you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully, and with deliberation and premeditation."[4] Before the jury began deliberating, the court explained the verdict form on attempted murder as follows: "And then there is another special finding on the attempted murder charge, there is the not guilty form, and then the guilty form has three paragraphs. *If you were to find him guilty of attempted murder, then you have to make a[n] additional finding,* whether the attempted murder was willful, deliberate and premeditated. True, not true." (Italics added.)

---

[3] The jury was instructed: "The defendant is charged in Count 2 with attempted murder. [¶] To prove that the defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill that person. [¶] A direct step requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts that plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt. [¶] A person who attempts to commit murder is guilty of attempted murder even if, after taking a direct step toward killing, he or she abandons further efforts to complete the crime, or his or her attempt fails or is interrupted by someone or something beyond his or her control. On the other hand, if a person freely and voluntarily abandons his or her plans before taking a direct step toward committing the murder, then that person is not guilty of attempted murder."

[4] The instruction went on to provide: "[Appellant] acted willfully if he intended to kill when he acted. [Appellant] deliberated if he carefully weighed the considerations for and against his choice and knowing the consequences decided to kill. [Appellant] premeditated if he decided to kill before acting. [¶] The length of time the person spends considering whether to kill does not alone determine whether the attempted killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. [¶] A decision to kill made rashly, impulsively or without careful consideration of the choice and its consequence is not deliberate and premeditated. [¶] On the other hand a cold calculated decision to kill can be reached quickly. The test is the extent of the reflection not the length of time. The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find this allegation has not been proved."

13

These instructions and the verdict form clearly informed the jury that it was to decide whether appellant was guilty of attempted murder and, if so, go on to find whether he committed the crime with premeditation and deliberation. The trial court created confusion, however, by giving two instructions indicating that appellant could not be found guilty of attempted murder unless the People proved he acted with willfulness, premeditation and deliberation. The first of those instructions, a modified version of CALCRIM No. 3428, stated in pertinent part: "You've heard evidence that Mr. Ramos may have suffered from a mental disorder. You may consider this evidence only for the limited purpose of deciding whether at the time of the charged crimes in Count 1, burglary, and Count 2, attempted murder, Mr. Ramos acted with the intent or mental state required for that crime. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state specifically . . . intent to kill for Count 2 . . . the willful deliberate and premeditated mental state for the enhancement to Count 2. [¶] If the People have not met this burden, you must find [appellant] not guilty of Counts 1 and 2." The court subsequently gave a modified version of CALCRIM No. 627, which stated in pertinent part: "You may consider evidence of hallucinations, if any, in deciding whether [appellant] acted with deliberation and premeditation. . . . If the People have not met this burden, you must find [appellant] not guilty. [¶] That should just say of attempted murder."

The jury later expressed its confusion on this point. During deliberations, it requested guidance on how to proceed on a particular enhancement, if "[t]he jury cannot come to a unanimous agreement." The jury also asked for clarification of the phrase "carefully weighed the considerations for and against his choice" in the instruction on the willful, deliberate and premeditated enhancement to the attempted murder charge. (See fn. 4, *infra*.) The court responded that votes on enhancements had to be unanimous, and that it could offer no further clarification of the quoted phrase.

The jury later informed the court it was unable to "come to a unanimous agreement on one enhancement" and asked if it could be "left blank." With a reference to

the modified version of CALCRIM 3428, the jury also asked "[i]f a unanimous decision cannot be reached on the enhancement, must the jury vote Not Guilty for the count?"

In discussing the issue with counsel, the court acknowledged, "I think I drafted [the instruction] rather inartfully. It should have been broken down more at the end." Based on the questions, the court assumed the jury was having a problem reaching a unanimous decision on the willful, premeditated and deliberate enhancement on the attempted murder count. With counsel's agreement, the court explained to the jury, "With regard to Count 2, as you know, Mr. Ramos is charged in that count with attempted murder, and there are three subparagraphs on that verdict form. [¶] And as you can see from the language of that, *you would never get to the enhancement unless you already voted to find him guilty of Count 2*." (Italics added.) The jury foreperson replied, "That is correct." The court then asked, "from your question, it sounds to me like the jury has not reached a decision as to the allegation under Count 2 of willful, deliberate and premeditated. Am I correct?"

The foreperson then disclosed that verdicts had been reached on all but Count 2, and the court collected the completed and signed verdict forms. After the foreperson stated her belief that further deliberations would be futile, three other jurors said they continued to have difficulty with the phrase "carefully weighed the considerations for and against his choice." Not long after, however, the foreperson informed the court that the three jurors had expressed their interest in deliberating further. After further deliberations, the jury returned a verdict on Count 2 convicting appellant of attempted murder and finding all three enhancement allegations to be true.

From this record, it is clear the jury did not interpret the instructions to require a finding of willfulness, premeditation and deliberation as an element of attempted murder. "When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner. [Citation.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.) Although the court gave two instructions erroneously stating that appellant had to be

15

found not guilty of attempted murder if the People failed to prove he acted willfully and with premeditation and deliberation, other instructions made clear that the allegation of willfulness, premeditation and deliberation was to be made *after* appellant was found guilty of attempted murder.  Moreover, the court responded to the jury's inquiry on the subject by emphasizing that "you would never get to the enhancement unless you already voted to find him guilty of Count 2."[5]  We presume the jurors were intelligent enough to understand this and appreciate that appellant could be found guilty of attempted murder and yet also found not to have acted with willfulness, premeditation and deliberation. (See *People v. Carey* (2007) 41 Cal.4th 109, 130.)  Appellant's claim of prejudicial instructional error fails.

DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

---

[5] This belies appellant's claim that the court failed to answer the jury's question as required under section 1138.

John Trice, Judge

Superior Court County of San Luis Obispo

_____


Richard E. Holly, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson, Supervising Deputy Attorney General, Robert M. Snider, Deputy Attorney General, for Plaintiff and Respondent.